ETHEL RICHARDS et al., Appellants-Respondents, et al., Plaintiffs, v ESTATE OF DORIS KASKEL, Respondent, and 360 EAST 72ND STREET OWNERS, INCORPORATED, Respondent-Appellant, et al., Defendants. (Action No. 1.)

ESTATE OF DORIS KASKEL, Appellant, v JOSEPH LUYBER et al., Respondents, et al., Defendants. (Action No. 2.)

First Department, May 23, 1991

## APPEARANCES OF COUNSEL

*Howard Schechter* of counsel *(Deirdre A. Nicolle* with him on the brief; *Schechter, Brucker & Pavane, P. C.,* attorneys), for appellants-respondents.

*Sherwin Belkin* of counsel *(Belkin Burden Wenig & Goldman,* attorneys), for Estate of Doris Kaskel.

*Alan C. Fried* of counsel *(Schwarzfeld, Ganfer & Shore,* attorneys), for respondent-appellant.

## OPINION OF THE COURT

SULLIVAN, J. P.

These appeals involve the interpretation of a 1972 judgment, entered in 1 of the 2 underlying actions, insofar as it required the cooperative corporation to offer renewal leases to the nonpurchasing tenants at the subject building.

Both actions arise out of the conversion of the building located at 360 East 72nd Street in Manhattan to cooperative ownership pursuant to an offering plan filed by the owner-sponsor in 1969 and declared effective as an eviction plan on April 21, 1971. Under the terms of the plan, those tenants who did not purchase their respective apartments could, notwithstanding their status as rent-stabilized tenants, be evicted at the expiration of their leases. After the declaration of effectiveness, plaintiffs, nonpurchasing tenants, claiming that the sponsor had obtained the requisite number of subscription agreements by false and fraudulent representations, without which it would not have been able to declare the plan effective on an eviction basis, brought an action (action No. 1) against the sponsor (the estate of Alfred L. Kaskel), the cooperative corporation (360 East 72nd Street Owners, Incorporated) and others for a declaration to that effect and as to their entitle-

ment, as nonpurchasing tenants, to continue in occupancy and receive lease renewals pursuant to the Rent Stabilization Law. The tenants ultimately prevailed when the Court of Appeals *(Richards v Kaskel,* 32 NY2d 524) reinstated the 1972 judgment of the trial court (69 Misc 2d 435), which had found the declaration of effectiveness to have been tainted by two sales secured as a result of the sponsor's false statements and directed the "co-operative corporation, as present owner of the building, to enter into leases with each of the nonpurchasing tenants" in accordance with the then-current Rent Stabilization Law. *(Supra,* 69 Misc 2d, at 444-445.) A review of its decision, however, reveals that the issue of whether the cooperative corporation or the sponsor should be named on the leases was never specifically presented to the trial court, which did expressly note that the provisions of the cooperative offering plan neither enlarged nor diminished rights under the Rent Stabilization Law *(supra,* at 444). Review of the Court of Appeals' decision discloses that the question of who should enter into the leases with the tenants was not at issue. Notably, at that time, the owner-sponsor and the cooperative corporation were essentially the same entity.

In 1973, two months after the Court of Appeals' determination, the cooperative corporation and sponsor moved in the trial court for a modification of the judgment to provide that the actual owner of the occupied apartments be substituted for the "cooperative corporation" as the party responsible for offering renewal leases. The motion was denied without prejudice to a similar application to the Court of Appeals. Since, as is typical of most cooperative conversions, the board of directors of the newly formed cooperative corporation was, for a period of time, controlled by the sponsor and was, for the most part, its alter ego, the sponsor, which became the owner of the unsold occupied apartments, foresook the opportunity to make such an application and adopted that format provided for in the 1972 judgment.

Thus, for the next 16 years, the sponsor's managing agent, Carol Management, offered rent-stabilized renewal leases to the nonpurchasing tenants and typically executed them as follows:

> "360 East 72nd Street Owners, Inc., Landlord
> By Carol Management Company, Agent
> By: _____ /s/ _____
>     Carol Management Company"

After executing the lease renewals, the tenants returned them to Carol Management, to which they paid rent.

As this record demonstrates, the cooperative corporation had no knowledge that leases were being executed in its name by Carol Management. It has never, from the time the shareholders assumed control of the board of directors, authorized the execution of leases in such manner. Carol Management, it should be noted, the family owned management arm of the Kaskel family, the sponsor, was retained by it to manage the apartments which it continued to own and which are occupied by the nonpurchasing tenants. To the extent that these tenants were entitled to services over and beyond those provided by the cooperative corporation to all shareholders, e.g., the painting of apartment interiors and replacement of appliances, such services were provided by Carol Management.

During this same period of time, the cooperative corporation used, at various times, either Douglas-Elliman Gibbons & Ives or Kreisel Company as its managing agent. Moreover, the nonpurchasing tenants always knew that in their rent-stabilized relationship with the sponsor Carol Management was representing the sponsor's interests. When these tenants sought services of the type provided to all shareholders, they made their requests to the cooperative corporation's managing agent. When they sought additional services predicated upon their rights as rent-stabilized tenants, they made their requests to Carol Management.

In any event, in 1989, in renewing these leases, the sponsor and Carol Management decided that the party who actually owned the apartments should be included in both the leases and the notice of renewal. Accordingly, the sponsor offered to issue renewal leases as follows:

"LANDLORD:

360 East 72nd Street Owners Incorporated,

Owner of the Building

Estate of Doris Kaskel, Proprietary Lessee and

Landlord of the Apartment."

The nonpurchasing tenants, 57 in all, refused to execute the renewal leases, as tendered. The two interested parties, the sponsor and the tenants, discussed various proposals but were unable to agree on any specific language. Thereafter, the cooperative corporation and the sponsor sought guidance from the New York State Department of Law. At that time, the

tenants were threatening to sue and had, on the basis of the dispute, collectively withheld more than $100,000 in rent.

Without waiting for the Attorney-General's opinion, the tenants, in March 1990, claiming a violation of the 1972 judgment because the renewal leases were being offered by the owner of the apartments (now the estate of Doris Kaskel), instead of the cooperative corporation, as required, moved to hold the cooperative corporation in contempt and for a direction that it comply with said judgment. Although unable to cite a single instance of the estate's failure, in almost two decades, to maintain the apartments or to comply with all the requirements of the Rent Stabilization Code, the tenants alleged an impairment of their rights and prejudice from the change in the form of the renewal leases.

■ Since the estate was not a party to the tenants' contempt motion, it commenced a separate but parallel action (action No. 2), seeking, *inter alia,* a declaration that the renewal leases it offered were in compliance with the Rent Stabilization Law and Code, and moved concurrently with the tenants' contempt motion for consolidation of the two actions and for summary judgment on its complaint. The tenants cross-moved to dismiss the estate's complaint on the ground of res judicata, citing the 1972 judgment. The IAS court denied the tenants' motion for a contempt finding on condition that the cooperative corporation offer the renewal leases, which were to be offered in precisely the form proposed by the estate in its declaratory judgment action, that is, the cooperative corporation was to be named owner of the building and the estate listed as owner, landlord and proprietary lessee of the subject apartments, with its managing agent, Carol Management, the duly authorized signatory in its behalf. The court directed that the renewal leases were to be effective as of the expiration date of each tenant's last lease and at a rental rate to be determined by the applicable Rent Guidelines Board order. Although agreeing that the estate, not the cooperative corporation, was the proper party to issue renewal leases to its own tenants, the court concluded that the Court of Appeals' determination in action No. 1 barred the grant of declaratory relief to that effect and dismissed the estate's declaratory judgment action.* It was error to hold that the cooperative

---

* Acting on the IAS court's recommendation, the cooperative corporation moved in the Court of Appeals to amend its 1973 order affirming the trial court's 1972 judgment to allow the relief sought in the declaratory judgment

corporation was obliged to offer the renewal leases since the estate, as proprietary lessee and holder of the unsold shares, is required by law to issue and execute the renewal leases to the nonpurchasing tenants in occupancy of the rent-stabilized apartments. Nor, on any fair reading thereof, does the 1972 judgment preclude the estate from offering such renewal leases. Thus, the estate is entitled to the declaratory judgment it sought. We modify accordingly.

■ A *cooperative corporation is not considered an "owner"* of a rent-stabilized housing accommodation within the meaning of the Rent Stabilization Code, which defines an owner as a "fee owner, lessor, sublessor, assignee, net lessee, or a proprietary lessee of a housing accommodation in a structure or premises owned by a cooperative corporation or association, or an owner of a condominium unit or the sponsor of such cooperative corporation or association or condominium development, or any other person or entity receiving or entitled to receive rent for the use or occupation of any housing accommodation, or an agent of any of the foregoing". (Rent Stabilization Code [9 NYCRR] § 2520.6 [i].) No doubt this definition was so fashioned because of the absence of any kind of privity between a cooperative corporation and a nonpurchasing rent-stabilized tenant in occupancy.

On the conversion of a rental building to cooperative ownership, a cooperative housing corporation is formed to take title in fee to the building. *(See, Susskind v 1136 Tenants Corp.,* 43 Misc 2d 588.) Shares of stock allocated to the respective apartments, as well as long-term leases, known as proprietary leases, are issued to the purchasers thereof *(supra).* Under a noneviction cooperative conversion offering plan, such as, as matters turned out, is involved here, tenants who do not purchase their rent-stabilized apartments but remain in occupancy become the tenant not of the cooperative corporation but of the shareholder and proprietary lessee of the apartment. *(See, Star v 308 Owners Corp.,* 130 Misc 2d 732.)

Typically, however, a sponsor of a cooperative conversion is unable to sell all the occupied rent-stabilized apartments and, as a consequence, becomes the holder of the unsold shares and the proprietary lessee of these apartments *(see,* 13 NYCRR 18.3 [w]) and thus the "owner" thereof within the meaning of the Rent Stabilization Code (§ 2520.6 [i]). Generally, as here,

action. The motion, deemed as one to amend the remittitur, was dismissed as untimely. *(Richards v Kaskel,* 77 NY2d 856.)

the sponsor is also the former owner of the building and landlord, whose ownership of the unsold occupied apartments continues. Thus, the nonpurchasing stabilized tenants do not acquire a new landlord in a cooperative conversion.

Since the proprietary lessee's landlord-tenant relationship with the nonpurchasing rent-stabilized tenant in occupancy is separate and distinct from the cooperative corporation's status as the owner of the building, the cooperative corporation cannot commence summary proceedings against such tenant on the basis of alleged nonprimary residency or, for that matter, even serve the requisite 120/150 day nonrenewal notice. *(Ivy 49-96 Coop. Joint Venture v Danberg,* 134 Misc 2d 523, 524.) It necessarily follows that if the cooperative corporation cannot elect not to renew a rent-stabilized tenant's lease, it cannot be obliged to offer such a renewal lease or to execute the same.

Although recognizing the estate, as the proprietary lessee, to be the proper party to issue such leases, the IAS court nevertheless directed the cooperative apartment to issue renewal leases to the nonpurchasing tenants in occupancy. It did so in the belief it was "constrained" by the Court of Appeals' decision upholding the 1972 Supreme Court judgment directing the "cooperative corporation" to issue renewal leases.

■ In our view, the IAS court, in so holding, erred. The purpose of the 1972 judgment, which dealt with a cooperative corporation and sponsor that, in reality, were one and the same, was to provide the nonpurchasing tenants with renewal leases from the proper party. That purpose is frustrated by having the cooperative corporation issue leases to which it is not a party and in which it plays no part. The judgment must speak to changed circumstances. A tendered lease which reflects the estate's proper role conforms to the spirit and purpose of the 1972 judgment and the Court of Appeals' affirmance thereof.

■ Nor, contrary to the IAS court's holding, does the doctrine of res judicata apply to the estate's separate action for a declaration that it is the proper party to offer the renewal leases. *O'Brien v City of Syracuse* (54 NY2d 353), upon which the court relied, is inapposite. The *O'Brien* court, articulating a transactional analysis approach in resolving res judicata issues, rejected the assertion of a trespass claim based on the same acts as those on which a previously brought de

facto appropriation claim had been unsuccessfully asserted. In so ruling, the court held, "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy". *(Supra,* at 357, citing *Matter of Reilly v Reid,* 45 NY2d 24, 29-30.)

The estate's action is not, however, based on the same claim at issue in the 1971 action; nor is it an attempt to advance the same claim under a different theory of law. The latter involved the nonpurchasing tenants' rights to remain in occupancy as rent-stabilized tenants. In finding for the tenants the court, by its 1972 judgment, sought to insure those rights by directing the cooperative corporation to issue them renewal leases. The identity of the offeror was, however, at most a tangential issue. On the other hand, the estate's action seeks a determination that it is now the proper party to issue the renewal leases. Moreover, there is nothing in the text of the 1972 judgment that requires the cooperative corporation exclusively to issue renewal leases in perpetuity. It merely placed a limited obligation on the cooperative corporation to issue renewal leases in 1972 to those tenants who, in accordance with its provisions, demanded such leases. Nowhere does the judgment impose a continuing obligation upon the cooperative corporation to issue and execute renewal leases beyond the initial offer. As already noted, the focus of the 1972 judgment was on insuring that the nonpurchasing tenants maintained their rent-stabilized status, not in identifying the party who was to offer them renewal leases. As long as the tenants' rent-stabilized rights are not being compromised, a lawful successor in interest such as the estate could, consistent with that judgment, properly offer and execute renewal leases.

In that regard, it is worthy of note that in seeking to hold the cooperative corporation in contempt for failing to comply with the 1972 judgment, the tenants do not claim that their substantive rent-stabilized rights are being violated. Nor do they claim that they were not offered renewal leases. They merely object to the offer of such leases by the estate, the owner of the apartments and their landlord. In such circumstances, their refusal to execute the renewal leases, as tendered, is unreasonable. They pay their rent directly to Carol Management, the estate's agent, which, in turn, maintains and services all of the nonpurchased occupied apartments and insures that all of the requirements of the Rent Stabilization

Code, including the timely offer of renewal leases, are being met. This relationship between the tenants and the estate has been a constant for almost 20 years. Moreover, to require the cooperative corporation, a legal stranger, to offer and execute renewal leases with the nonpurchasing tenants serves no useful purpose. For example, if a tenant defaulted on its obligation to pay rent, neither the corporation nor the estate could commence a nonpayment summary proceeding, the former because it is not in privity with the tenant, the latter because it is not designated as the landlord in the lease. Since the obligation to pay rent stems from a lease covenant, only the landlord named in the lease can enforce its terms.

■ Finally, we note that, insofar as is pertinent, section 2520.12 of the Rent Stabilization Code specifically addresses the issue of inconsistencies between lease provisions or the terms of other rental agreements with the Rent Stabilization Law and Code as follows: "The provisions of any lease or other rental agreement shall remain in force pursuant to the terms thereof, except insofar as those provisions are inconsistent with the ETPA, the RSL or this Code, and in such event such provisions shall be void and unenforceable." In light of such a clear and unequivocal command, the 1972 judgment cannot be continued to be applied in a manner inconsistent with the Rent Stabilization Law and Code. The estate is entitled to a declaration, as sought, that the rent-stabilized renewal leases offered by it are in compliance with the requirements of the Rent Stabilization Law and Code.

■ Since the renewal leases offered to the tenants by the estate comport fully with rent stabilization requirements, there has been no willful denial of rights and the sanction of contempt does not lie. Notably, the estate, in its renewal offer, used the lease renewal form prescribed by the Division of Housing and Community Renewal (DHCR) for rent-stabilized tenants, which does not require the owner's signature or that he or she be named therein.

To sustain a finding of civil contempt based upon a violation of a court order, it must be shown that the mandate purportedly violated was clear and explicit and the violation established with reasonable certainty. *(Matter of McCormick v Axelrod,* 59 NY2d 574, 583; *Coan v Coan,* 86 AD2d 640, 641, *appeal dismissed* 56 NY2d 804, *lv dismissed* 57 NY2d 608.) There must also be a showing that the conduct complained of was "calculated to or actually did defeat, impair, impede, or prejudice the rights or remedies" of a party to a civil proceed-

ing. *(Oppenheimer v Oscar Shoes,* 111 AD2d 28, 29; *Matter of McCormick v Axelrod, supra,* at 582-583; Judiciary Law § 753 [A] [3].) Analysis of all the relevant considerations in the instant matter leads inescapably to the conclusion that the IAS court properly refused to hold the cooperative corporation in contempt.

In this connection, the 1972 judgment, on its face, lacked the necessary clarity and precision to sustain a contempt. To the extent that the judgment directed the cooperative corporation to offer renewal leases in accordance with the Rent Stabilization Law and Code it is internally inconsistent since, as already noted, the sponsor, not the corporation, as the owner of the apartments, is obligated to offer such leases. Since the 1972 judgment, in compelling the cooperative corporation to do what it legally could not, i.e., tender renewal leases to nonpurchasing tenants for apartments as to which it was not the owner, and in failing to impose a continuing obligation upon the corporation to offer and execute renewal leases beyond the initial 1972 offer, was not clear on its face, as is required for a contempt finding, such a finding against the corporation was unwarranted. Any ambiguity in the court's mandate should be resolved in favor of the would-be contemnor.

Moreover, there has been no demonstration whatever that the nonpurchasing tenants have been deprived of any rights by virtue of the cooperative corporation's refusal to issue renewal leases. As long as they have been offered rent-stabilized renewal leases, they are fully protected. Their tenancies remain intact, and the estate, which has been providing them with maintenance services for almost 20 years and to whose agent, for all of that time, they have been paying rent, must comply with the requirements of the Rent Stabilization Law and Code, including the obligation to offer renewal leases. (13 NYCRR 18.3 [n].) There is no claim that the estate is in default of its obligations. We are thus at a loss to understand how plaintiffs' rights as rent-stabilized tenants will be impaired or reduced if the sponsor is listed as the landlord in the renewal leases.

The suggestion that life is "simplified" in terms of the tenants' ability to obtain services if the cooperative corporation is named as landlord is meritless and, in any event, irrelevant, since such a claim does not rise to the level of that type of prejudice required for a finding of contempt. As this

record reveals, to the extent that the nonpurchasing tenants sought services over and above those provided to all shareholders, the services were performed by Carol Management, the sponsor's agent. Finally, plaintiffs' suggestion that the cooperative corporation would have a greater interest than the estate or other individual owners of unsold shares in maintaining the unsold apartments finds no support in the record and, in fact, flies in the face of reality. The cooperative corporation has no interest in expending funds—it has not done so in the past 20 years—to maintain those apartments. Nor is there any incentive for it to provide rent-stabilized services to the tenants of those apartments.

Accordingly, the order of the Supreme Court, New York County (Beatrice Shainswit, J.), entered on or about September 19, 1990, which, *inter alia,* conditionally denied plaintiffs' application to hold the cooperative corporation in contempt, should be modified, on the law and on the facts, to delete the requirement that the name "360 East 72nd Street Owners Inc." appear as owner on the renewal leases and, except as thus modified, affirmed, without costs or disbursements. The order of the same court and Justice, also entered September 19, 1990, which, *inter alia,* granted defendants' cross motion to dismiss the complaint, should be modified, on the law, to deny the cross motion, reinstate the complaint, grant plaintiff's motion for summary judgment and declare in its favor that the rent-stabilized renewal leases offered by it are each in compliance with the Rent Stabilization Law and Code and, except as thus modified, affirmed, without costs or disbursements.

CARRO, ELLERIN, WALLACH and Ross, JJ., concur.

Order of the Supreme Court, New York County, entered on or about September 19, 1990, modified, on the law and on the facts, to delete the requirement that the name "360 East 72nd Street Owners Inc." appear as owner on the renewal leases and, except as thus modified, affirmed, without costs or disbursements. The order of the same court and Justice, also entered September 19, 1990, modified, on the law, to deny the cross motion, reinstate the complaint, grant plaintiff's motion for summary judgment and declare in its favor that the rent-stabilized renewal leases offered by it are each in compliance with the Rent Stabilization Law and Code and, except as thus modified, affirmed, without costs or disbursements.